Donnelly v. State.

---

## JAMES P. DONNELLY *vs.* THE STATE.

1. Upon a writ of error to reverse a conviction in a criminal case, the presence of the party convicted is not necessary, either for the purpose of assigning errors or to receive the judgment of the court.

2. Errors may be assigned by counsel, and judgment may be pronounced in the defendant's absence.

3. Where the party convicted is in confinement, in pursuance of the judgment pronounced against him, and is not represented by counsel, he has a right to appear personally in court to have counsel assigned him, or to assign errors, and conduct his cause in person.

4. But where the prisoner is represented by counsel authorized to prosecute the writ of error, his personal presence in court upon the proceeding in error is neither a technical necessity nor a legal right.

5. In such case, a writ of *habeas corpus* will not be allowed to bring the prisoner into court, unless it appear that his personal presence in court is necessary or material to the protection of his rights.

6. A recital in the assignment of errors not in accordance with the facts will be stricken out.

7. That the court, in its charge to the jury, argued the facts of the case, or gave a partial view of the evidence against the prisoner, constitutes no legitimate ground of error or of a bill of exceptions.

Donnelly v. State.

8. And though a bill of exceptions for such cause be allowed and sealed, the assignment of error will be stricken out.

9. An indictment for murder contained four counts; in the first, the mortal wound was charged to have been given with a dagger; in the second, with a dirk, made of iron and steel; in the third, with a knife; and in the fourth with a dirk-knife. There was also in the different counts a variation in the description of the injury charged to have been inflicted; verdict, guilty on the four counts. *Held*, that the four counts charged but one offence, and that the verdict was good, the mode of death being substantially the same.

10. If the jury find the substance of the charge, the manner of entering the verdict, whether upon one count or upon four, can only be regarded (if erroneous) as an imperfection or lack of form, and cannot in anywise prejudice the defendant in maintaining his defence upon the merits. It constitutes, therefore, under the statute, no ground of error.

11. A witness, on cross-examination, cannot be examined relative to a matter upon which he was not examined in chief, and which is material only by way of defence.

12. On the trial of an indictment for murder, the state gave in evidence declarations of the deceased, as dying declarations; and to show that they were made under a sense of impending death, proved that the deceased, after receiving the fatal injury, made a testamentary disposition of a sum of money, found, not in his immediate possession, but in the bed where he slept at the time of receiving the injury. *Held*, that a statement of the deceased, of the amount of money in the bed at the time of making the testamentary disposition was competent evidence.

13. The conduct of the trial and the general course of the examination of witnesses constitute no ground of error.

14. It is essential to the admissibility of dying declarations, and it is a preliminary fact, to be proved by the party offering them, that they were made under a sense of impending death. Their admissibility is a question of competency, to be decided by the court.

15. What constitutes a dying declaration is a question of law. Whether the circumstances shown upon the trial evince that the statement offered is what the law denominates a " dying declaration," is the proper subject of review upon a writ of error.

16. The credibility of statements admitted as dying declarations are exclusively for the jury; but the jury are not authorized to reject such declarations as incompetent, if, in their opinion, they were not made under the apprehension of impending death.

17. A statement made in the presence of the party accused, affecting himself and not contradicted by him, is admissible in evidence against him, unless such statement is made under circumstances which prevented a reply, or rendered a reply improper.

18. Dying declarations are not admissible in evidence if the person mak-

Donnelly v. State.

ing them has no belief in a God and in a future state of rewards and punishments; but the law will presume such belief until the contrary is proved. The objection goes to the competency, not to the credibility of the testimony.

19. Where dying declarations are admitted in evidence, the conduct of the person making them during the time they are made may be shown to the jury, for the purpose of affecting their credibility.

20. To constitute murder in the first degree under the statute of this state, there must be an intention to take life. No particular time need intervene between the formation of the purpose to kill and its execution. It is enough if the design to kill be fully conceived and purposely executed.

21. Bills of exception should be prepared, and sealed immediately, during the progress of the trial. If that is not done, the court will be warranted in treating the exceptions as nugatory.

22. A bill of exceptions should state specifically the grounds of objection to the evidence offered, and should apprise the court and the adversary of the precise objection intended to be made.

23. In an assignment of errors, the grounds of error should be specified.

---

This cause came before the court by writ of error to remove to this court the judgment of the Court of Oyer and Terminer and General Jail Delivery in and for the county of Monmouth.

At the September Term of said court, in 1857, James P. Donnelly was indicted and tried for the murder of Albert S. Moses. The jury rendered a verdict of guilty of murder in the first degree, and judgment was entered on the verdict.

On the trial, a number of exceptions were taken to the evidence and the charge of the court, the substance of which sufficiently appears in the opinions delivered in this court.

To reverse this judgment, a writ of error was brought, removing the cause to this court. The writ was returnable to November Term, 1857.

November 4th, 1857.—Present, the CHIEF JUSTICE, and ELMER, POTTS and HAINES, Justices.

*J. P. Bradley*, *W. Pennington* and *J. W. Scott* appeared for the plaintiff in error, and *Joel Parker*, prosecutor of Monmouth Pleas, and *W. L. Dayton*, attorney-general, for the state.

The prisoner's counsel stated that a writ of error had been allowed in this case by the Chancellor, and was issued returnable to the present term, but was not yet returned. They asked for a rule to assign errors in three days, and that the cause be set down for hearing on Wednesday, the 11th instant.

The attorney-general assented to the proposed arrangement.

The court consented to set the cause down for hearing at the time specified, but declined making any order before the writ of error was returned. Counsel thereupon agreed that the errors should be assigned, and a copy served on the counsel of the state in three days.

The counsel of the prisoner thereupon asked that he should be brought into court by writ of *habeas corpus*, issued to the sheriff of the county of Monmouth, and that he might be present in court during the proceedings on the writ of error.

They made the following points :

1. The presence of the prisoner in court is essential ; he cannot be represented by attorney.

2. He may himself bring the writ of error, and errors must be assigned by the defendant himself. He may claim to argue it in person ; at common law he was bound to do so.

3. In practice it is usual to hear criminal causes upon a case reserved. In such case the record is not removed, and the presence of the prisoner is not necessary. But by writ of error the record is removed, and as a matter of course, the prisoner follows the record. He must be brought before the court where the record is, otherwise he is not *sub potestate curiæ*.

4. The prisoner must be present to receive the sentence of the court. If the judgment be affirmed, he is to be executed by virtue of the judgment of this court. If the judgment be reversed, it is the judgment of this court that discharges him.

5. Though this court has not a prison of its own, as the Court of King's Bench has, yet the jail of the county in which the court sits has always been deemed the prison of this court. The court has (and in ancient times exercised) original criminal jurisdiction in the county where it held its sessions, and the jail of such county has always been deemed the prison of the court.

6. The right of the prisoner to be present is clear; the only doubt is, whether the *habeas corpus* is to be sued out by the prisoner or by the state. We submit that it is the duty of the counsel of the state to have the prisoner brought into court.

The *Attorney-General, contra.*

1. The prisoner is entitled to be present in court during his trial and until final judgment, but he has no right to be present upon proceedings in error.

2. In practice in this state, the prisoner is never brought up by *habeas corpus* upon writ of error; nor does he assign errors in person.

3. There is no necessity for removing him by *habeas corpus*. He is under the power of this court in whatever jail he may be. Every sheriff is an officer of this court, and bound to obey its commands.

4. The hazards of escape and the responsibility of the sheriff will be greatly increased by the prisoner's removal.

5. If the prisoner is entitled to be present personally in this court, it is clearly not the duty of the state to bring him here. Final sentence has been pronounced against the prisoner: unless that sentence be reversed, it will be carried into execution. The burthen of obtaining the reversal is upon the prisoner. The court will not impose that duty upon the state.

The court took time to advise until Monday, November 9th.

On the 9th of November, the opinion of the court on

the application for the writ of *habeas corpus* was delivered by the CHIEF JUSTICE.

The defendant having sued out a writ of error, his counsel asked that he may be brought into court by writ of *habeas corpus*. It is also submitted that the writ should issue at the instance of the attorney-general, and at the expense of the state.

1. Is there a legal necessity for the personal presence of the prisoner in court, in order to prosecute his writ of error? It is said that he cannot act by counsel, and that he must therefore be present in person in order to assign errors. The ancient rule of the common law upon the subject was one of great strictness. The personal presence of the prisoner was necessary at every stage of the proceedings, from the arraignment and plea to the final sentence. He could not appear or plead by attorney. He was not entitled to the benefit of counsel. It was a matter not of right, but of favor, granted or denied at the pleasure of the court. The same rule seems to have been applied to the prosecution of writs of error. Upon an examination of the precedents in the books, we have found no criminal case whatever where the errors have been assigned otherwise than by the defendant in person. Such, it is presumed, is the ancient well-settled practice of the English courts.

But a totally different practice appears to have prevailed in this state upon proceedings in error. Upon as full an examination of the precedents as has been practicable since the application, we do not find a single case where upon writ of error the prisoner has been brought into court upon *habeas corpus* or has assigned errors in person.

In the *State* v. *Price*, 6 *Halst.* 203, the defendant was convicted in the Sussex Oyer and Terminer of a misdemeanor (burning buildings), and sentenced to ten years' imprisonment. The cause was removed into this court, and subsequently into the Court of Errors, and the judg-

ment affirmed. The defendant, during the pending of the writs, was in prison undergoing his sentence. No *habeas corpus* appears to have issued. Errors were assigned by counsel.

In the State *v.* Parke, the prisoner was convicted of murder, and at May Term, 1845, was sentenced by this court to be executed. The cause was removed by writ of error into the Court of Errors, and at July Term, 1845, the judgment below was affirmed. No writ of *habeas corpus* appears to have been issued, and no order was made to bring the prisoner before the Court of Appeals. He was in fact at no time personally before the court, nor did he, from the time that sentence was pronounced against him in this court, so far as appears by the record, take any personal part in the proceedings. The application to the Chancellor for the writ of error was made by counsel. The assignment of errors is in the name of counsel, and is signed by him, not by the prisoner. The judgment was rendered in the absence of the prisoner. In the State *v.* Carter, decided at the same time, precisely the same proceedings were adopted, though by different counsel.

In *The State* v. *Fox*, 1 *Dutcher* 566, the defendant was convicted and sentenced, in the Middlesex Oyer and Terminer, for the crime of murder. The record was removed into this court by writ of error, and the judgment affirmed. No writ of *habeas corpus* was issued. The defendant was not before the court. Errors were assigned by his counsel. Final judgment was pronounced in his absence.

These cases meet one of the suggestions made by counsel upon the argument, that the prisoner is executed by virtue of the judgment of the higher court, and that he must therefore necessarily be present when the sentence is pronounced. This question, though not raised or discussed by counsel, attracted the attention and underwent the consideration of this court in the case of The State *v.* Fox. It appeared then to the court, that if the prisoner was to be sentenced here, he must necessarily be present.

But the judgment in error in capital cases, as in others, is simply of affirmance or reversal of the sentence pronounced upon the prisoner by the court below. By virtue of that sentence he is executed. The mandate for execution issues from the court below, not from the Court of Errors. The prisoner is executed by virtue of that mandate. The writ of error does not suspend its execution or impair its efficacy. If the judgment of the court below is not reversed, if their mandate for execution is not annulled, it will be the duty of the sheriff to execute it, notwithstanding the writ of error. Such was the unanimous opinion of this court in The State v. Fox, and the judgment in that case was conformed to the judgment in the Court of Errors in the case of The State v. Parke and The State v. Carter. Such must have been the opinion of the late Chief Justice and of the Court of Errors, by whom judgment was rendered in those cases. Such must have been the opinion of the learned attorney-general, by whom those prosecutions were conducted, and of the able counsel by whom they were defended. No new mandate was issued. The prisoners were executed under the sentence of this court.

But that the execution is done by virtue, not of the judgment of the Court of Errors, but of the court below, is manifest from the fact that the writ of error is often brought after the judgment is executed, or while it is in process of execution. In England, writs of error in capital cases were more usually brought by the heir, after execution for felony, to reverse the attainder. So in Cook v. The State the sentence had been executed, the fine had been paid before error brought. In the cases of Price, of West, and of Dodge, which will be hereafter more particularly referred to, the plaintiff in error was in prison, undergoing the sentence of the court below, while the case was pending in this court upon error. In case of reversal, he must be brought before this court to be discharged from imprisonment. But in case of affirmance, is a new sentence to be pronounced, and is he to endure one part

of his punishment upon the sentence of one court, and the balance upon the sentence of another? The inquiry carries its answer upon its face. No such practice has ever been adopted.

But if the presence of the prisoner is necessary in cases of murder to conduct a writ of error, or to receive the judgment of the court, it is, upon the principles of the English law, equally so in all other cases of felony or crimes above mere misdemeanors. But upon examining the precedents, we do not find a single case where, upon writ of error, the defendant was either brought into this court or prosecuted the writ in person.

In *Berrian* v. *State*, 2 *Zab.* 1, on conviction of perjury in the Middlesex Oyer, where the record was removed by the defendant into this court, and by the state into the Court of Errors.

In *West* v. *State*, 2 *Zab.* 212, on the conviction of forgery in the Burlington Oyer, and writ of error to this court.

In *Smith* v. *State*, 3 *Zab.* 130, on conviction of nuisance in the Passaic Oyer, and writ of error to this court, and subsequently to the Court of Errors.

In *Francisco* v. *State*, 4 *Zab.* 30, on conviction of misdemeanor in the Passaic Oyer, and writ of error to this court.

In Dodge *v.* State, at February Term, 1854, on conviction of perjury in the Somerset Oyer, and writ of error to this court; and

In *Cook* v. *State*, 4 *Zab.* 843, on conviction of rape, and writ of error to this court and the Court of Errors, no *habeas corpus* was issued or order made to bring the defendant into court. In all these cases errors were assigned by the prisoner's attorney or counsel. Judgment was rendered in his absence.

We think it must be considered as settled by the practice in this state, that in proceedings upon writ of error the personal presence of the prisoner in court is not a technical necessity; that he appears by counsel, errors

are assigned by counsel, and judgment may be pronounced in the defendant's absence.

2. But if the prisoner's presence is not a matter of legal necessity, is it a matter of right, to which he is legally entitled, if demanded? If a writ of error be sued out and returned to this court in a case where the prisoner had no counsel, and the court were apprised of the fact by any person on his behalf, he would have a right to appear personally in court, to have counsel assigned, or to assign errors, and argue them in person. In such case his presence would be clearly a legal right. And so it would be if counsel disclaimed their authority or denied their ability to prosecute the writ or to assign errors without the presence of the prisoner. But where the prisoner has counsel by whom he was defended, and by whom he is represented here, his personal presence is neither a technical necessity nor a legal right. In many of the cases to which reference has been made the defendants have been represented by the most experienced and learned counsel at the bar; in several of them, by one or the other of the counsel now representing this defendant, who are not used to overlook or forego any legal right of their clients. Indeed, in capital cases it is not the province of counsel to waive or to forego any legal right of the prisoner. Under such circumstances, the fact that this right has never been claimed or exercised, is a strong argument against its existence, and we know of no legal principle upon which it can rest.

3. But though the personal presence of the prisoner during the argument of his case before this court be neither a technical necessity nor a legal right, it remains a question whether, as it is clearly in the power of the court to bring him before them, his request should be granted, either from the tenderness due to a fellow creature in the situation of the prisoner, or from a regard to the feelings and wishes of his counsel. If this were a mere matter of personal concern in which the court were at liberty to

indulge their feelings, we should certainly prefer that no
legal request of the prisoner or his counsel which it is in
the power of the court to grant should be denied. But it
must be borne in mind that the prisoner is now under-
going the punishment inflicted upon him by the sentence
of the law. A part of that sentence was, that he should
be kept in strict and close custody in the jail of the
county of Monmouth until his final execution. Ought this
court, except in a clear case of right or of necessity, to
interfere with the execution of that sentence? Nor can
it be disguised that the removal of the prisoner from a
distant portion of the state, and permitting him, during
the progress of the argument, from day to day to attend the
sitting of the court, will materially add to the hazards of
escape, and the consequent responsibility of the officers hav-
ing him in charge. And though it be true that upon a ques-
tion of right these considerations should weigh but as dust
in the balance, yet upon a mere question of feeling they can-
not be overlooked.

Nor are we able to perceive any real advantage that can
result to the prisoner or his counsel from his presence
during the argument, or any disadvantage that can accrue
by reason of his absence. None has been suggested by
counsel. Aside from mere technicality, no reason is per-
ceived that requires the presence of a defendant upon the
argument of a writ of error, more than upon the argument
of a case reserved, though in such case the prisoner is
never present. Yet it never has been suggested, as an ob-
jection to proceeding upon a case reserved, that the pris-
oner was deprived of any real advantage. In the cases
of *The State* v. *Aaron*, 1 *South.* 231, *The State* v. *Guild*, 5
*Halst.* 175, and *The State* v. *Davis*, 1 *Dutcher* 386, the ma-
terial questions raised upon the trial were reserved, and
very elaborately argued at the bar of this court in the ab-
sence of the prisoner after conviction. Every argument
for the presence of the prisoner which could be urged in

this case would have been equally strong in those, so far as any real advantage to the prisoner is involved.

Upon the whole case, we are of opinion that the application must be denied.

On motion of the attorney-general, the following order was then entered in the minutes of the court:

A writ of error in the above-stated cause having been allowed and issued, returnable to the present term of this court, and application having been made on behalf of the plaintiff in error by his counsel, Joseph P. Bradley, William Pennington, and Joseph W. Scott, that a writ of *habeas corpus* do issue to the sheriff of the county of Monmouth to bring the said James P. Donnelly before the court, that he may assign errors in person, and be present at the hearing of the said cause; and William L. Dayton, the attorney-general, in behalf of the state, consenting that the application be now heard and decided without prejudice, as if the writ of error were actually returned, and the return thereof perfected; and the court having heard the arguments of counsel, and taken time to advise thereon until this ninth day of November; and the court being of opinion that the plaintiff in error may lawfully assign errors by his attorney and counsel, and that his personal presence in court is not necessary for the purpose aforesaid, nor upon the hearing of the said cause, and the prisoner being in fact represented by his attorney and counsel, and there being no suggestion that the plaintiff in error is unwilling to be so represented, or that his rights will be in anywise prejudiced thereby, or by reason of his not being present in person before this court—It is ordered, that the motion for the writ of *habeas corpus* be denied.

On the eleventh of November, the writ of error being returned, the counsel for the plaintiff in error suggested to the court that the return was defective.

The record returned with the writ was a certified copy. The original record was made up and on file in the office of the clerk of the county of Monmouth.

It was insisted that the original record must be returned ; no copy would answer.

The court ordered that leave be given to have the return amended.

November 12th.   *Bradley*, for plaintiff in error, stated to the court that he had the writ of error and return, and the bill of exceptions, and moved for an order that they be filed.

BY THE COURT.   No order is necessary.   Let the return be filed, and the court will then hear any motion counsel may wish to make.

The writ and return, and assignment of errors having been filed,

*Bradley* moved that the state join in error forthwith.

The assignment of errors was as follows :

Afterwards, to wit, on the first Tuesday of November, in the term of November, in the year of our Lord one thousand eight hundred and fifty-seven, before the justices of the Supreme Court of New Jersey, at Trenton, come William Pennington, Joseph P. Bradley, and Joseph Warren Scott, esquires, the counsel of the said James P. Donnelly, and pray the court, in his behalf, that a writ of *habeas corpus ad subjiciendum*, &c., may be issued to the sheriff of the county of Monmouth, requiring and commanding the said sheriff to have the body of the said James P. Donnelly before the said justices here forthwith, [in order that he, the said James P. Donnelly, may assign his errors of and upon the premises, and submit himself to the judgment of the court here, &c.,] but the said justices disallow the said writ, and [refuse to make order for the removal of the said James P. Donnelly

before them, and adjudge that the said James P. Donnelly do assign his errors by his counsel learned in the law, and day is given for that purpose until the twelfth day of November, in the year aforesaid, in this same term, at Trenton aforesaid, at which day and place] thereupon the said counsel, on behalf of the said James P. Donnelly, state and show to the court here that, in the record and proceedings aforesaid, and also in the giving of judgment aforesaid, there is manifest error in this, that, at the trial of the said indictment before the said Court of Oyer and Terminer and General Jail Delivery, the said court did exclude and overrule evidence offered in behalf of the said James P. Donnelly which was lawful and admissible in the law; and there is also error in this, that the said court did admit and allow evidence to be given against the said James P. Donnelly on the said trial which was illegal and inadmissible in the law; and there is also error in this, that the charge of the said court to the jury was contrary to law; [and there is also error in this, that the said court, in and by their said charge, did invade the province of the jury, by arguing the facts of the case before the jury against the said James P. Donnelly; and there is also error in this, that the said court, in and by the said charge, did give a partial view of the evidence against the said James P. Donnelly, and omitted the circumstances in his favor;] and there is also error in this, that the verdict of the jury is repugnant, inconsistent, and void; and there is also error in this, that judgment was given against the said James P. Donnelly, whereas judgment should have been given in his favor; wherefore the said James P. Donnelly, by his said counsel, prays judgment, and that the judgment aforesaid, for the errors aforesaid, and other errors found and being in the record and proceedings aforesaid, may be reversed, annulled, and altogether held for nothing, and that the said James P. Donnelly may be restored to all things which he has lost by occasion of the said judgment, and that the court

here may proceed to examine the record and proceedings aforesaid.

The attorney-general moved to amend the assignment of errors, by striking out the recital of the record relative to the application for the *habeas corpus;* also the following errors : " And there is also error in this, that the said court, in and by their said charge, did invade the province of the jury by arguing the facts of the case before said James P. Donnelly ; and there is also error in this, that the said court, in and by the said charge, did give a partial view of the evidence against the said James P. Donnelly, and omitted the circumstances in his favor."

To sustain the position that the court might strike out errors, he cited *Lewis* v. *Lawson,* 1 *Root* 262 ; *Dennis et al.* v. *Alexander,* 3 *Barr* 50 ; *Hamet* v. *Dundass,* 4 *Barr* 178 ; *Sailor* v. *Hertzogg,* 10 *Barr* 296.

*Bradley,* for the prisoner.

1. As to the recital of the record in assignment of errors, it is the same as in a common declaration where there is a recital of process, &c. If it is not a proper part of the record, then it is not here properly ; but if it is on the record, then it is a proper part of the assignment of errors. 2 *Saund.* 389.

2. As to errors assigned. The court will not anticipate their decision. The charge of the court is on the record, and before deciding whether it was right or not, the court should hear argument upon it. The errors should not be struck out. In the Pennsylvania cases cited, the errors were not struck out.

*Pennington,* on same side. The errors assigned are in the language of the court below. The introductory part was framed in reference to the recital, which is usually a part of the record.

The *attorney-general,* in reply. The point is, that the

recital is no part of the record. They are attempting to foist new matter into the record. They might have asked leave of the court to assign errors by counsel, if their right so to do was doubted. *U. S. Dig.* 326, § 37; *People* v. *Clark,* 1 *Parker* 300.

*Scott,* for the prisoner. Why the prisoner appears by counsel should appear on the record.

On this motion the following opinion of the court was de-dilivered by the CHIEF JUSTICE:

The writ of error in this case, with the record of the court below and the bills of exceptions sealed on the trial, having been this day returned and filed, and the defendant, by his counsel, having assigned errors, moves the court that the state's counsel join in error *instanter.* The counsel of the state, before filing a rejoinder in error, ask the court to strike from the assignment of errors the recital, and also certain errors therein assigned.

If it be admitted that the recital be, as the counsel contend it is, a proper and necessary part of the assignment of errors, it is certainly highly important that the recital should conform strictly to the facts of the case.

It is recited in the assignment, among other things, that "the said justices did disallow the said writ of *habeas corpus,* and refuse to make order for the removal of the said James P. Donnelly before them, and adjudged that the said James P. Donnelly do assign his errors by his counsel learned in the law, and day is given for that purpose, until the twelfth day of November, in the year aforesaid, in this same term, at Trenton." All the court did was simply to deny the application for the writ of *habeas corpus.* The court did not refuse to make order for the removal of the said James P. Donnelly; no such order was asked. The court did not adjudge that the said James P. Donnelly do assign his errors by counsel. On the contrary, it will be recollected that, although the counsel of the de-

fendant themselves, after applying for the *habeas corpus*, requested an order that errors should be assigned in three days, the court declined to make any such order, or any other order, until the coming in of the writ of error. The time and the mode of assigning errors was left entirely to counsel. They might have suggested that it was not in their power to assign errors; that the presence of the prisoner was absolutely necessary for that purpose : nay, they might have said that they did not represent the prisoner at all. And the court, in delivering its opinion, said expressly, that if the prisoner were without counsel, he would have a legal right to be present, and have counsel assigned him, or assign errors in person. We left it to counsel to act untrammeled, and to pursue just such course as their own judgment and sense of duty to their client might dictate. The court never did adjudge that errors should be assigned by counsel. We presume there is no such order on the minutes of the court—none such was ever made or intended to be made.

Again, no day was given, until the twelfth of November, for the defendant to assign errors. In fact the record was not here until this day, the twelfth of November, and the assignment of errors was filed by counsel immediately upon filing the writ; and yet, according to this recital, on the first Tuesday of November, day was given to the defendant, until the twelfth, to assign errors, when in fact the record was not here until the twelfth. This may be a mere formal matter. Perhaps it is; but in a case of so grave moment, it is better that the record should state just as the fact is, that time was given until the twelfth, for the return of the writ, and not for the assignment of errors.

In these particulars, clearly, the assignment should be amended.

But the more important question arises upon the motion to strike out two of the assignments of error. They are these, viz., that the court, in and by the said charge,

did invade the province of the jury, by arguing the facts of the case before the jury against the said James P. Donnelly ; and also, that the said court, in and by the said charge, did give a partial view of the evidence against the said James P. Donnelly, and omitted the circumstances in his favor.

We are of opinion that neither of these matters constitutes a legitimate ground of error, or of a bill of exceptions.

1. Because the act gives the prisoner in criminal cases a bill of exceptions as in civil cases. The right is no broader in one case than in the other. In a civil case, it is most clear that the objections embraced in these assignments are not legal grounds of error.

2. Because an examination of these errors will inevitably involve an examination of the whole merits of the case upon the evidence, whereas the power of this court is limited to a review of mere questions of law.

3. Entertaining these views, no possible benefit can result to the prisoner from our hearing questions discussed, upon the decision of which his rights cannot depend, and for which the judgment cannot be reversed. It is suggested that the assignment is in the words of the exception ; and the judge having signed the bill, we are bound, at least, to hear the question argued. But if a judge inadvertently at the circuit, in the haste of trial, signs a bill of exceptions involving matters of sheer indifference, or a question of fact, as whether the prisoner is guilty or not guilty, it is not therefore properly a ground of error.

Personally, we should prefer to hear the argument upon these assignments to making a decision that may even seem to the prisoner or to his counsel to narrow in the slightest degree the privilege of review. But we are now called upon to settle, for the first time under the statute, an important question of practice, and it is important that it should be settled upon right principle.

The motion must be allowed.

The court, on motion of the attorney-general, then made the following order:

It is ordered by the court, that so much of the recital in the assignment of errors as avers that the court did " refuse to make order for the removal of the said James P. Donnelly before them, and did adjudge that the said James P. Donnelly do assign his errors by his counsel learned in the law," and also so much of the said assignment as recites that "day is given for that purpose until the twelfth of November, in the year aforesaid," be stricken out, as not being in accordance with the facts.

And it is also ordered, that so much of the said assignments as assigns for error, that the court, in and by the said charge, did invade the province of the jury by arguing the facts of the case before the jury against the said James P. Donnelly; and also that part of the said assignment which assigns for error that the said court, in and by the said charge, did give a partial view of the evidence against the said James P. Donnelly, and omitted the circumstances in his favor, be stricken out.

The state then joined in error, and the argument was commenced by

*J. W. Scott,* for the prisoner.

There are five counts in the indictment, and of course five issues. Every separate count charges a distinct offence. 3 *Durn. & East* 106.

The verdict speaks absolute verity; it finds the fact. The jury have found the first count of the indictment true, and everything repugnant to it not true. They have found the defendant guilty on the first four counts in the indictment, and not guilty on the fifth. The verdict actually finds that Moses was murdered, and died four times on the same day. The four counts are totally irreconcilable; each count negatives the other, so that the jury, by their finding, have three times affirmed that the

prisoner was not guilty upon either count. It amounts to a verdict of acquittal. 5 *Bac. Ab.*, "*Verdict*" *B*, § 3; *Rolle's Ab.*, *pl.* 51, *p.* 703–8. The jury have found a physical impossibility. Repugnance in a material part of the indictment is fatal; and if the jury, by their verdict, find the indictment to be true, is it not fatal to the case? Neither in civil or criminal proceedings must the counts be repugnant.

If the different counts had charged that the assault was made upon one Albert S. Moses, there might have been different men; the same name does not show identity, but the counts charge that it was upon the same person.

*Bradley*, on same side.

1st exception. It was important for us to trace the prisoner's clothing. It is objected that this was not properly a cross-examination. The answer is that we had a right to cross-examine fully as to all that occurred at the house; it was strictly a cross-examination.

2d exception. Moses' declarations were mere hearsay; they were not competent to prove sanity. Dying declarations are not admissible to prove anything outside of the cause of death.

3d exception. I shall not press this point, as it was apparently settled in the Fox case.

4th, 5th, and 6th exceptions, all relate to the same point. Our objection is, that at the time that Moses' dying declarations were received, there was no proof of his condition at the time he made them. This was important; the conviction of the prisoner depended upon the dying declarations of Moses. The reception of dying declarations has been limited to criminal cases and to the circumstances of the death : not allowed to extend to collateral circumstances. 1 *Phil. Ev.* 278–282.

It may be said that the judge is to decide on the state of mind of the deceased person. The judge is to decide that they are dying declarations, and the proof must show

that they are such. 9 *Humph. R.* 9, *Smith* v. *State.* The dying person must have a belief in God and in a future state of rewards and punishments. To a stoic or disbeliever, impending death would be no sanction. 1 *Phil. Ev.* 289; 23 *Miss.* 323, *Lambert* v. *State; Wharton's Crim. Law* 247–8.

The first exception was taken when there was no evidence of the state of mind of the deceased. Court and counsel both admitted and held that declarations were important, as showing consistency of declarations.

Admitting there was *prima facie* evidence before the judge enough to admit dying declarations, still the evidence was treated unfairly by the judge in his charge. The judge told the jury they must judge of Moses' dying declarations by his belief in a future state. *Crim. Dig.* 146, *pl.* 115; *Carter* v. *People,* 2 *Hill* 317.

This principle applies *a fortiori* to a witness on the part of the state, upon whose sole evidence the life of the prisoner depends.

Admitting that the evidence was at first properly admitted, still when the facts were shown, the jury should have been told that they ought not to regard it.

The dying declarations of Moses were unlawfully admitted.

7th exception. The evidence was admitted on the ground of Donnelly's presence; not offered as dying declarations, but as made in the presence of the prisoner.

Declarations in the presence of an accused party are only admitted in the light of admissions. How could these be admissions? The state should have shown that Donnelly assented to what was said, or that it was brought to his notice, and he did not deny it. *Commonwealth* v. *Kenney,* 12 *Metc.* 235.

There is no pretence that Donnelly did anything to admit charge; but the evidence was admitted simply on the ground that the declarations were made in his presence. *Kendrick* v. *State,* 9 *Humph.* 722; *Crim. Dig.* 166, § 339;

*State* v. *Mix,* 15 *Mod.* 153; *State* v. *Wolfe, Ib.; Crim. Dig.* 687.

Next, as to reasonable doubt. Reasonable doubt is to arise upon legal evidence; the doubt is not to spring from the juror's inward conscience, but from the evidence in the cause. *Wills on Cir. Ev.* 149; *Burrill on Cir. Ev.* 737, 739; *U. S. Crim. Dig.* 584, § 72.

The charge of the court was erroneous in defining the degrees of murder. The deed was not committed to get money.

The judge charged, that if the design to kill were formed at the instant of striking the blow, it would be murder in the first degree. I admit it would answer at common law; it would be malice aforethought, but would not be premeditated killing. 1 *Parker* 347, *Sullivan* v. *People; State* v. *Turner, Wright's R.* 20; *Clark* v. *State,* 8 *Humph.* 671; *Dale* v. *State,* 10 *Yerger* 551; *U. S. Crim. Dig.* 318, § 504.

*J. Parker,* for the state.

A general verdict on the four counts is good, as it is the same felony and murder stated in all, varying only the instrument to meet the proof. *Wharton's Crim. Prac.* 13; *Am. Crim. Law* 153.

The jury found him guilty of but one felony and murder. The language of the record is "guilty of *the* felony and murder on him above charged in the form aforesaid, as by the first four counts in the indictment aforesaid is above supposed against him, of the first degree," &c. This did not injure defendant on merits. *Nix. Dig.* 189.

As to first exception to evidence. A party has no right to cross-examine a witness, except as to facts and circumstances connected with the matters stated in his direct examination. He must make the witness his own in subsequent progress of the cause. 1 *Greenl. Ev.,* § 445; *Floyd* v. *Bovard,* 6 *Watts & Serg.* 75, 76, 77; 14 *Peters' R.* 461.

As to second exception to evidence.

1. The fact that the communication was made to the

witness, and not its truth or falsity, was the material point. *State* v. *Fox*, 1 *Dutcher* 602–3; 1 *Greenl. Ev.*, § 100.

2. This evidence was also admissible, as connected with and leading to the disposition of deceased's property, which is certainly competent testimony.

3. The evidence was also admissible to test sanity and accuracy of deceased, which was a chief point of defence.

Upon inquiry as to the state of mind of a person at a particular period, his declarations and conversations are admissible. 1 *Greenl. Ev.*, § 108; 2 *Hill's R.* 257, *note b.*

As to third exception to evidence.

The asking of a legal question on re-examination, if omitted on the first examination, is within the discretion of the court, and is no error. *State* v. *Fox*, 1 *Dutcher* 602; 14 *Peters' R.* 463.

As to fourth, fifth and sixth exceptions to evidence. They are similar.

1. The admission of dying declarations is for the court, after satisfactory evidence that the deceased has a sense of impending death. 1 *Phil. Ev.* 269, *note* 3; 2 *Leading Crim. Cases* 238.

This court, upon error, will not reverse where evidence is admitted founded upon a preliminary issue of facts settled by the court below.

2. But this question of sense of impending death, was *at the request of defendant's counsel*, submitted to the jury, with instructions to exclude and reject the dying declarations, if they found them made without a sense of impending death.

This court, upon error, will not go behind that decision of the jury. 11 *Georgia R.* 377.

This question has in some cases been left to the jury. 11 *Georgia R.* 376; *Woodcock's case*, 1 *Leach* 502; 2 *Pothier* 293.

3. But if this court will look behind the decision of the court below, and also the decision of the jury, it will be

found that the dying declarations were properly admitted.

It is not necessary for deceased to have expressed a sense of impending death ; it can be gathered from all the circumstances surrounding him, the position of deceased, the nature of injury, as well as what he said, or was said to him.  1 *Greenl. Ev.*, § 158; 1 *Phil. Ev.* 264; *Hill's case*, 2 *Grattan* 622–23–24; 6 *Car. & Payne* 386.

Declarations are admissible, if made without hope at the time they are made.  *State* v. *Grunzig*, 1 *Parker's Crim. R.* 299.

Declarations of what deceased said, as to who did the deed, may be admitted simultaneously with evidence proving his sense of impending death, and is not error.  *Hill's case*, 2 *Grattan* 625–26–27 ; *Am. Crim. Law* 249 ; *State* v. *Freeman*, 1 *Spears* 57, 66.

The declarations to Smith and Brough are admissible, as part of *res gestæ*, as well as dying declarations, being made immediately after the injury, before time was given to frame an account of the affair.  *Commonwealth* v. *Pike*, 3 *Cush.* 181, 184; 6 *Car. & .Payne* 325, note a ; 2 *Grattan* 604–5 ; *Skinner* 402.

As to seventh exception to evidence.

1. This evidence is part of the circumstances of the death, the *res gestæ*.  *Am. Crim. Law* 247.

2. Evidence admissible to prove the sanity of deceased, which had been raised by the defendant.

When the question of sanity is raised, all declarations and conversations of the person are admissible.  1 *Greenl. Ev.*, § 108 ; 2 *Hill's R.* 257, note b.

3. This evidence was legal, also, on the ground of admission, as to language, conduct and demeanor of defendant, on hearing statement concerning himself.  5 *Car. & Payne* 332; 1 *Parker's Crim. R.* 17 ; 7 *Car. & Payne* 832.

Statement need not be made to defendant, but in his presence.  *Am. Crim. Law* 258–59; 1 *Moody & Malkin* 336 ; 21 *Pickering* 517–18, 521–22.

As to first exception to judge's charge.

The question of his religious belief was properly left to the jury.

The law will presume he had such belief until the contrary appear. 1 *Greenl. Ev.*, § 370; *Am. Crim. Law* 304, *note* 1.

This question was preliminary to the admission of the evidence, and should have been raised on the trial before the declarations were offered. 1 *Greenl. Ev.*, § 370.

As to second and third exceptions to charge.

They were questions of fact entirely, and were properly left to the jury.

As to sixth exception to charge.

As to benefit of doubt, the charge was correct. 1 *Parker's Crim. R.* 35; 1 *Leading Crim. Cases* 359.

As to the seventh exception to charge.

It is sufficient if the premeditation and deliberation exist the moment before, and at the infliction of the mortal blow, to make it murder of the first degree.

If there be a mistake as to an abstract proposition in charge, the whole charge will be applied to the facts of the case under consideration. 2 *Parker's Crim. R.* 302–3.

The facts here make the crime murder of first degree.

*Finally*, there is then no error, either in the record, in the ruling as to the evidence, or in the charge to the jury.

*Dayton*, attorney-general.

On the 1st point, as to the indictment and repugnancy of verdict, he contended that if the subsequent count had charged a killing one *other* Albert S. Moses, indictment would have been bad; and that the finding, being guilty of the felony and murder charged, was technically right. 1 *Chit. C. L.* 253; *Arch. C. P.* 34, 35; 3 *Chit. C. L.* 767, 1129; *State* v. *Webster*, wherein the counts and verdict were substantially the same as in this case. *Whart. Cr. Prec.* 311; *State* v. *Parke; State* v. *Carter.*

But if the verdict were erroneous, it did not affect defendant's defence on the merits. These words in our statute have a technical meaning, well-understood in the profession. *Nix. Dig.* 189, § 2.

1st exception to evidence. The whole evidence in behalf of state had been as to the identity of the deceased. The question to the witness was in reference to clothes of prisoner, another branch of the case. It was no cross-examination. The defence cannot take case out of hands of state, and anticipate their defence. It would throw confusion into the whole proceeding.

Besides, this whole evidence was afterwards received, when offered by the defence, and if any error had existed, it was cured.

As to 2d exception to evidence: " How much money did Moses say there was ?"

This was not to prove the fact *per se*, that there was so much money, but simply that he called attention to the money, its place of deposit, and the fact that he claimed it.

The amount of the finding, &c., was proved by others.

It was part of the *res gestœ*, connected with the disposition of his property by will.

It showed his perfect self-possession and consciousness because he stated the several amounts in the different packages, amounts of specie and of paper. It was irrelevant for any other purpose.

As to 4th, 5th, and 6th exceptions as to the admission of these dying declarations. The amount of evidence which will justify the admission of these declarations was for the court alone.

The court decided, as a matter of fact, that the evidence justified the admission of said declarations. This was a question of fact, and on error this court cannot review that decision.

The only error of the court below was in favor of the prisoner, when it subsequently, at request of prisoner's

counsel, authorized the jury to reject such declarations as they thought were not made under a sense of impending death. This was a preliminary fact, to be settled finally by the court.

7th exception. The evidence was confused as to what Moses said in Donnelly's presence.

If Donnelly did not assent, or denied it, it was competent for defence to show it.

It was a charge made on Donnelly to his face. Moses once said, " Donnelly, you know you are the man that did it." Nothing in condition of parties to prevent a reply or denial. The fact that Moses was dying, did not make these conversations worse evidence than they would have been, had both been unhurt.

These declarations, too, are competent, we contend likewise, as part of the *res gestœ*, and to show condition of Moses' mind.

As to judge's charge.

1st exception. Question of religious belief was left to jury, at request of prisoner's counsel. This was an error of court in favor of prisoner.

I insist that this question of man's religious belief should never have been admitted into the jury box; it would be dangerous in the extreme; it is a preliminary question, to be determined finally by the courts. 1 *Greenl. Ev.*, § 157; 3 *Car. & P.* 598, *note;* 9 *Ib.* 395; 2 *Moody C. C.* 135; 2 *Russel on C.* 688; *Roscoe's Ev.* 96, 97, *note* 1.

2d and 3d exceptions to charge.

Contended that it was no error for courts to refuse to express an opinion on the tendency of the evidence. 13 *Shep. (Maine) R.* 243.

4th exception. As to definition of reasonable doubt.

Judge says, if they doubt in " their inward consciences" his guilt, they should acquit.

This is surely right; it was saying only, if you conscientiously doubt, acquit. The court meant that each juror should judge for himself upon the facts.

It is always exceedingly difficult to make a jury understand exactly what is meant by "reasonable doubt." The expression, through ignorance of its meaning, has acquitted more guilty men than any other expression or principle known in the books.

5th exception.     As to definition of degree of murder cited. *Nix. Dig.*, § 4; *Ch. Just. Hornblower's opinion in State v. Spencer; Whart. C. L.* 420; 18 *Miss.* (3 *Ben.*) 417, 435; 3 *Selden's R.* 385.

*Pennington*, in reply.

1. If the judgment is reversed, the result is, there will be a new trial. It is not trying a man twice for the same offence. The constitution of New Jersey means that no person, after acquittal, shall be put in jeopardy, &c., for the same offence.

2. The evidence was not offered as a dying declaration; it was to show that the money was Donnelly's, and to show Moses' knowledge.

3. The weight of dying declarations depends upon the man; the judge is to settle it. At the time the dying declarations of Moses were admitted, there was no evidence before the judge that Moses, at the time he made them, believed he would die; the fact that the doctor had told him he would die, is not enough; he must himself believe it, and give evidence of such belief.

To entitle dying declarations to be received in evidence, the rule is, that the person making them must believe in a God and in a future state of rewards and punishments.

Moses' dying declarations may have been rendered competent evidence afterwards, but were not competent when offered; the judge admitted them too soon.

4. The question, "What did Moses say, in Donnelly's presence, was the occasion of Donnelly's doing it?" was an improper question, and should have been overruled.

5. The judge erred in his charge defining the degrees of murder.

The opinion of the court was delivered by the CHIEF JUS-TICE.

The first error relied on is, that the verdict of the jury is repugnant, inconsistent, and void. The first four counts of the indictment charge the prisoner with the murder of Albert S. Moses. In the first count the mortal wound is charged to have been given with a dagger, in the second count with a dirk made of iron and steel, in the third count with a knife and in the fourth count with a dirk knife. The fifth count charges the prisoner with the murder of a male person, whose name is to the grand jurors unknown, with a certain sharp instrument, to the grand jurors unknown. There is also in the different counts a slight variation in the description of the injury charged to have been inflicted. The verdict is, that the said James P. Donnelly is guilty of the felony and murder on him above charged in form aforesaid, as by the first four counts of the indictment aforesaid is above supposed against him, of the first degree, and that the said James P. Donnelly is not guilty of the felony and murder on him above charged in the fifth count of the indictment aforesaid. It is insisted that the verdict is irreconcilably repugnant, for it finds the prisoner guilty of committing the murder by four different instruments; that it is of a thing impossible, for it finds him guilty of causing the death of the same individual four times; and that it is absurd, inasmuch as finding him guilty on one count negatives his guilt on each of the others. The verdict simply finds the defendant guilty of one crime, viz., the murder and felony charged in the first four counts of the indictment. Those counts charge but one offence, viz., the murder of Albert S. Moses. Each charges that his death was occasioned by violence, though by means of different instruments. But it is well settled that the instrumental

cause of death, as charged in the indictment, is immaterial, provided it be proved that the deceased suffered the same kind of death as charged in the indictment. The proof of the instrument wherewith the fact is done is not absolutely necessary to the proof of the fact itself. The same evidence, therefore, which would convict the prisoner upon one of these counts would be sufficient to convict him upon each of the others. If, therefore, it was proved to the satisfaction of the jury that the crime charged was committed by the defendant, it was immaterial whether the mortal wound was given with a dirk, a dagger, a knife or a sword. The substance of the thing is, that the prisoner inflicted a mortal wound whereof the deceased died. *Mackally's case*, 9 *Coke* 67 *a;* 1 *Gilbert's Ev.* 872 ; 2 *Hawk. P. C.,* cap. 46, § 37 ; 2 *Hale's P. C.* 185, 291 ; *Arch. Cr. Pl.* 211 ; *State* v. *Fox,* 1 *Dutcher* 601. In *Rex* v. *Waters,* 7 *Car. & Payne* 250, Lord Denman held that if in an indictment for murder, the death of the deceased is charged to be by suffocation by placing the hand on the mouth, the allegation is made out, if the jury are satisfied that any violent means were used to stop the respiration of the deceased. The instrument with which the offence is committed is in reality no part of the finding, any more than the particular day or the precise length and depth of the wound charged in the indictment. The legal effect of the verdict of guilty upon the four counts, therefore, is not that the deceased came to his death four times, or by four different instruments, but simply that the deceased died of a mortal wound inflicted by the prisoner by cutting with a sharp instrument. The apparent incongruity arises from a tenacious adherence to ancient forms in criminal pleading, while in proof the form is discarded, and the substance alone is recognized.

If one of these counts charged the murder to have been occasioned by drowning, and another by poisoning, and another by cutting or stabbing, there the alleged repugnancy would exist, for the evidence which would sup-

port the one count would not support the others. And this we presume to have been the substantial ground of difficulty in the case of the State *v.* Moran, referred to by counsel upon the argument.

In the case of *The Queen* v. *O'Brian, Rogan and others,* for the murder of Benjamin Gott (1 *Denison's Crown Cases Reserved* 9), the indictment contained four counts. The second count charged that the mortal blow was given by John O'Brian with a stick held in his hand, and that the other defendants were present aiding and abetting. The third count charged, that the mortal wound was given by Thomas Rogan, with a stone cast or thrown by him, and that the other defendants were present aiding and abetting. Upon the trial, it appeared that the deceased was struck both with a stick and a stone. The surgeon testified that he could not say which caused death. The judge told the jury that if they thought Gott died of a wound given by a stick, the second count was proved, and if he died of a wound given by a stone, the third count was proved. The jury found a general verdict of guilty, being probably doubtful whether death was occasioned by the stick wielded by O'Brian, or the stone cast by Rogan. And upon a case reserved the verdict was sustained, the court saying there was no difference between the legal effect of the second and third counts, the mode of death being substantially the same in both, although a stick was alleged to be used in one count, and a stone in the other. The doubt of the jury was therefore immaterial.

Upon the strictest common law principles, the verdict is right.

But if there were room for doubt upon this point, or even if it should be admitted that the verdict is technically erroneous, and should have been rendered not upon four counts, but upon one only, it is not perceived how the judgment can, for this cause, be reversed without directly contravening the provision of the statute. The act (*Nixon's Dig.* 189, § 2,) enacts, that no judgment given

upon any indictment shall be reversed for any imperfection, omission, defect in, or lack of form, nor for any error, except such as shall or may have prejudiced the defendant in maintaining his defence upon the merits. If the jury have found the substance of the charge, the manner of entering the verdict, whether upon one count or upon four, can only be regarded as an imperfection or lack of form, nor can it in anywise have prejudiced the defendant in maintaining his defence upon the merits.

The remaining errors relate exclusively to the conduct of the cause, and are founded upon bills of exceptions sealed during the progress of the trial.

The first exception upon which error is assigned is, that the following question, asked of Augustus D. Tomkins, upon cross-examination by the defendant's counsel. was overruled, viz.: "Whilst you were at the premises, did you see any of the clothing or effects of the prisoner taken possession of by any person; if so, by whom?" If the answer to the question was at all material, it was so only by way of defence, and did not constitute matter of cross-examination. The witness had been called to prove certain maps of the premises which were used upon the trial, and also the disposition made by him of certain articles of clothing found in the rooms occupied by the deceased at the time of his death, in order to his identification as Albert S. Moses, the person named in the indictment. No question had been asked by the state's counsel touching the clothing or effects of the prisoner. The question was properly overruled. It appears that the objection was not to the evidence, but to the time and manner of offering it, for the same witness was called for the defence after the state had rested, was examined without objection, and testified to the very matter which forms the subject of this exception.

The second exception is, that the following question, asked by the counsel for the state, and objected to by defendant's counsel, was not overruled, viz.: "How much

money did Moses say there was?" This question was asked of the proprietor of the house in which the homicide was committed. The witness had previously stated that in the bed where the deceased slept, and where the fatal blow had been given, between the mattresses, he had found ninety-one dollars in parcels, which he had particularly described. At the time of the conversation, and when the money was found, the deceased was lying on a bed in an adjoining room, where he had thrown himself, or fallen after the fatal blow was given. It was material for the prosecution to show a motive for the homicide. This the state attempted to do by offering evidence tending to prove that a sum of money was found in the bed where Moses slept; that a part of that money had been previously intrusted to Donnelly by a boarder in the house, and had been won from him by Moses, the deceased, the night previous to the murder, by playing at cards. Now the mere fact that the money was found in the bed where Moses slept proved nothing. It might have been there without the knowledge of Moses. It might have been concealed there by Donnelly himself, or some one to whom he had intrusted it. But the fact that Moses pointed out the place where the money was concealed, that he stated the amount correctly, and described it minutely, tended strongly to raise the presumption that Moses placed the money there, and that it was in fact in his possession. Again, the evidence was competent, as showing the condition of Moses' mind after he received the injury. A part of the defence relied on was, that the injury received by the deceased, in the opinion of medical men, was calculated to impair his intellect and subject him to the influence of illusions or false impressions, and that under such illusion he in fact made the charge against Donnelly. It was competent then, as showing that at the time he made the charge he was under no illusion, that his memory retained its power, and that his judgment and discrimination remained. It is

true that when this evidence was offered the defendant had not yet opened this ground of defence. But if it be true, as was proved by experts called by the defence, that the injury sustained by the deceased was calculated to derange ·the mental faculties, it was competent for the state to meet the objection *in limine*, and to show, by his acts and words, that he was laboring under no hallucination, and that his mental faculties were unimpaired. Again, it was competent for the state to prove the testamentary disposition of his property made by the deceased, a circumstance tending to show that he was under the apprehension of approaching death. This statement of the amount of the money was immediately connected with the testamentary disposition of it by the deceased. He could not in fact have made an intelligible disposition of the property without stating how much was his, and how much belonged to another. In either of these aspects, this evidence was competent. It is material to observe that the evidence was not offered to prove what amount of money was found in the bed. That was proved by direct testimony. But it was offered as a part of a transaction, in which the deceased pointed out where his property was, and directed what disposition should be made of it upon his death.

The third exception is, that · the court permitted the following question, asked by the counsel of the state, and objected to, to be answered, viz. : " Where was Donnelly standing on the back piazza, in reference to the corner of the house, when you were talking to him ? " We understand it to be admitted that the objection was not to the competency of the evidence, but to the time of offering it, viz., after the witness had been cross-examined. This objection was considered and overruled in the case of *The State* v. *Fox*, 1 *Dutcher* 602. The conduct of the trial and the general course of the examination of witnesses rests very much in the discretion of the judge, and does not constitute a ground of error.

Donnelly v. State.

The fourth, fifth and sixth exceptions all relate to the admissibility of the statements of the deceased touching the commission of the crime as dying declarations. The questions arose upon the testimony of Peter F. Schenck, of William W. Smith, and of Francis Brough. The objection at the trial was first made to the testimony of Mr. Schenck, though the statement made to him by the deceased, was the last in order of time. It becomes necessary, therefore, to consider the circumstances under which the several declarations were made, as well as the principles upon which statements of deceased persons are admitted as dying declarations.

Dying declarations derive their sanction, as testimony, from the fact that they are made under the apprehension of approaching dissolution, in the view and expectation of speedy death; the situation of the party, under such solemn circumstances, creating a sanction equally impressive with that of an oath administered in a court of justice. 1 *East's P. C.* 354; 1 *Phill. & Amos on Ev.* 295; 1 *Greenl. Ev.,* § 157; *Wharton's Cr. Law* (ed. 1857), § 669.

It is essential, therefore, to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them, that they were made under a sense of impending death. If not so made, they are not admissible in evidence. It consequently becomes necessary that the circumstances under which the declarations are made should be shown to the judge, it being his province, and not that of the jury, to determine whether they are admissible. It is a question of competency, which addresses itself to the court, and which must be met and decided by the court. If the declarations were in point of fact made under a sense of impending death, in view and expectation of the immediate approach of that solemn event, they are to be admitted in evidence. If they are not so made, they are to be excluded from the consideration of the jury. 1 *East's P. C.* 354, 360; 16 *Howell's St. Trials*

24, *and note*; 1 *Phill.* & *Amos. Ev.* 297; *Greenl. Ev.*, § 157; *Wharton's Cr. Law* (*ed.* 1857), § 671.

It is suggested, as a preliminary objection, by the counsel of the state, that whether the person making the declarations was or was not under a sense of impending death, was a mere question of fact, to be decided by the judge; and that, being a mere question of fact, it is not the subject matter of a writ of error, and cannot be drawn in question in this court. The answer to the objection is, that the decision involves a mingled question of law and of fact. What constitutes a dying declaration is a question of law. Whether, therefore, the circumstances shown upon the trial evince that the statement offered is what the law denominates a dying declaration, is a question of law, and the proper subject of review upon a writ of error. In dealing with this question the court here will give to each fact sworn to its appropriate effect, without questioning the credibility of the testimony or the truth of the facts put in evidence. Upon the mere credibility of the testimony, upon this preliminary issue, the decision of the court below must be regarded as final. With this statement of what we conceive to be, upon this issue, the appropriate sphere of the duty of a court of error, we proceed to consider the question, whether, under the facts in evidence when the statements of the deceased were offered, the court below erred in admitting the statements in evidence to the jury as dying declarations.

Evidence had been offered, on the part of the state, tending to show that the deceased died from a wound inflicted with a sharp instrument on the left side of the neck or throat, six inches in depth, perforating the *œsophagus*, severing the jugular vein and a branch of the carotid artery, and inflicting other internal injury; that the wound in its nature was very dangerous, and the possibility of recovery from it very doubtful; that in point of fact the deceased died from the effect of the wound soon after its infliction; that the wound was inflicted

while the deceased was in bed; that after receiving the injury, he had raised the cry of murder, and had followed the murderer through an adjoining room into the hall, bleeding very profusely; that a few steps from the door of the room, through which he had passed into the hall, he had fallen or stopped, and had there lost a large quantity of blood; that he thence returned toward his room, and entering the outer room adjoining his own, had fallen or laid himself upon the bed, from which he never rose; that Mr. Smith, the proprietor of the house, the first person who entered the room, and who came soon after hearing the alarm, found him upon the bed bleeding very profusely. Upon entering the room, the wounded man threw up his hands, called the witness by name and repeated that he had been stabbed; that he had been murdered; that his throat had been cut. The witness then stated, "I asked him who by; he said Donnelly, your book-keeper." This is one of the declarations objected to. Upon this evidence alone, excluding all the testimony regarding the condition of the deceased from this moment till the time of his death, was not the court below justified in admitting this statement in evidence as a dying declaration? The facts before the court were that the deceased had received a most dangerous wound, from which recovery was very improbable, which was likely very soon to prove mortal, and from which, in fact, the injured man died within an hour and a half. That the statement was voluntarily made immediately after the injury, to the first person that he spoke to while lying upon his bed weakened by loss of blood; that in fact he was at the moment bleeding to death; that the declaration was made within ninety minutes of his death, and was preceded by a declaration that he was murdered. Was not that statement made under a sense of impending death? Is there any evidence to warrant the belief that at that time or at any time afterwards, he had the least expectation or hope of recovery? It is not necessary that the party injured should state, at

the time of making the declarations, that they were made under a sense of impending death. It is enough, if it satisfactorily appears in any mode that they were made under that sanction. It may be directly proved by the express language of the declarant, but it may also be inferred from his evident danger, or the opinion of his attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind at the time of making the declarations. 1 *Greenl. Ev.*, § 158; 1 *East's P. C.* 358; *Woodcock's case, Leach's Cr. Cas.* 441; *Hill's case*, 2 *Grattan's R.* 794; *The State* v. *Freeman*, 1 *Spear's R.* 57.

Declarations made by the injured party immediately after receiving the injury have in some cases been received as competent evidence, though not as dying declarations. *Rex* v. *Foster*, 6 *Car. & P.* 325; *Commonwealth* v. *M'Pike*, 3 *Cushing* 181. In the latter case (in some of its features very similar to the present) it was held that the declaration of a person who is wounded and bleeding, that the defendant had stabbed her, made immediately after the occurrence, though with such an interval of time as to allow her to go from her own room up stairs into another room, is admissible in evidence after her death as a part of the *res gestæ.*

It is not designed to place this case at all upon that ground. We regard the evidence as admissible as dying declarations made under a sense of impending death. The only occurrence, or expression of the deceased, which could be supposed to intimate that he entertained the least hope of life at any time after receiving the injury, was that upon Munter's entering the room some time afterwards, the deceased inquired if he was a doctor, and if he could stop the bleeding. This circumstance is relied on as showing that the injured party entertained hopes of recovery. But no such inference is fairly to be drawn from it. *The Queen* v. *Howell*, 1 *Denison's Cr. Cases* 1.

The question here is not a question of the weight of

testimony, but whether there were facts before the court below which warranted them in admitting the evidence of Smith, and upon that point we think the court did not err.

Francis Brough, another of the witnesses whose evidence is objected to, saw the deceased a short time after Smith, and the admissibility of his evidence rests substantially upon the same ground.

The admissibility of Peter F. Schenck's evidence, who is the third witness whose testimony is objected to, rests upon somewhat different grounds. Though examined first as to the dying declarations, his evidence relates to a point of time posterior to that of either of the other witnesses. Previous to his examination, the nature and character of the injury received by deceased, his condition after the injury, and the fact that he had giv directions for the disposition of his property, had been proved. The witness then states that the person acting as surgeon, who was trying to staunch the blood from Moses' neck, told him he could live but a short time, and cautioned him not to accuse any one wrongfully; and then, in answer to a question, who cut his throat, Moses said Donnelly did it. Shortly after the witness returned again to the room, another individual then asked Moses if he was aware that he could live but a short time—but a few minutes; he nodded his head, and said, yes. The attendant then said, now be sure you don't accuse any one wrongfully; Moses then said that Donnelly, the book-keeper, cut his throat. To the admission of this last evidence an objection was interposed, and the court held it competent. When the court made this decision there had been proof before them of the dangerous nature of the wound, of the condition of the deceased; that he had made a testamentary disposition of his property; that he had been told that he could live but a short time, and that he himself had declared that he was aware of it. Upon such evidence there seems to be no room for doubt.

We are of opinion, looking at the decisions of the court below solely in the light of the evidence before it when these several decisions were made, that the evidence in each case was rightfully admitted, and that there is no error, upon this subject, in the decisions of the court.

But if there were doubt upon this point, or even if it clearly appeared that the court below had admitted the statements of Moses as dying declarations, before it had been satisfactorily proved that he was, at the time of making such declarations, under a sense of impending death, yet if, in the progress of the trial that fact was subsequently established by satisfactory proof, there would be no ground for reversal. The record would show that, in point of fact and of law, the statements thus admitted were made under a sense of impending death, and were therefore competent to be given in evidence as dying declarations. There would be no error by which the prisoner could have been prejudiced in his legal rights, or in maintaining his defence upon the merits. Upon the whole case made by the state, there seems no room for doubt that, from the time Moses was first spoken to, down to the last word he uttered, he felt and spoke under a sense of impending death. The nature of the injury, the circumstances which accompanied and immediately followed it, which are clearly and forcibly presented in the charge of the court, would naturally, if not necessarily produce that impression. That impression must have been deepened into conviction by his increasing weakness, by his fast-ebbing life, by the statements of the medical attendants and others around him, and by the repeated warnings that were given him by the acquaintances of the accused that he was about to die. In addition to all this, we have his own repeated assertion that he was murdered, and that he knew he was to die in a very short time. During this whole period, the statements in regard to the manner and circumstances of his injury, and in regard to the person by whom it was inflicted, were consistent, uniform,

Donnelly v. State.

and unvarying. They were made in the presence of the party accused, and in his absence; they were adhered to amid warnings of his own grave responsibility and intimations of the wrong done to the accused. He was told that his story was improbable; that the room was dark, and he could not see; that he was incapable of doing what he alleged he did do; but he adhered to the same statement until the hand of death was upon him, and he asked to be permitted to die in peace. The case is marked by strong and peculiar characteristics, and if the statements of a dying man are ever to be deemed competent and legal evidence for the consideration of a jury, the statements of Moses must be so regarded.

There is no complaint that the court did not decide the question of the competency of this testimony. The ground of error is, that they decided erroneously, not upon the legal principle governing its admission, but upon the elements which compose dying declarations. Having decided that these statements were dying declarations, and as such competent evidence, the court, in its charge, submitted the same question to the jury. The law was stated to them in clear and emphatic terms. The jury were told that they were to consider, in the first place, whether Moses, when he made the declarations, was under the belief that he was at the point of death, and every hope of this world gone, and that they were to decide whether each of his declarations were made under the sense of impending death, and entirely to reject all declarations which in *their opinion* were not made under such apprehension. This instruction we regard as incorrect; and if the court had themselves avoided the decision of that question, and shifted the responsibility to the jury, the instruction would have been fatally erroneous. It was a question of law, and the prisoner was entitled to have the decision of the court directly upon the point. The credibility of the statement, the weight to which it was entitled, was entirely for the jury. They could believe or disbelieve it, but after the

court had decided that it was competent testimony, the jury were not authorized to reject it as incompetent, any more than they would have been if the court had decided that the evidence was incompetent, to take it into their consideration. The instruction being in favor of the prisoner, giving him not only the judgment of the court but of the jury also, it affords no ground of error.

The seventh exception is, that the court permitted the following question to be asked by the counsel for the state, viz. : "What did Moses say, *in the presence of Donnelly,* was the occasion of Donnelly's doing it?" The witness had previously stated that the wounded man had said repeatedly that Donnelly did it, (*i. e.,* inflicted the wound.) The evidence was not offered as a dying declaration, but as a statement made in Donnelly's presence, and not denied. It is unnecessary, therefore, to consider the question whether it formed a part of the dying declaration of the deceased, and was so connected with it as to render it competent in that aspect. It was obviously offered and admitted under a different aspect.

A confession may be inferred from the conduct and demeanor of a prisoner when a statement is made in his presence affecting himself, unless such statement is made under circumstances which prevented a reply. *Bartlett's case,* 7 *Car. & P.* 832; *Joy on Conf.* 77; 1 *Greenl. Ev.,* § 215; 1 *Phil. & Amos* 422.

In the most recent treatise on criminal law the rule is thus stated : "Where a man, at full liberty to speak, and not in the course of a judicial inquiry, is charged with a crime, and remains silent, that is, makes no denial of the accusation by word or gesture, his silence is a circumstance which may be left to the jury." *Wharton's Cr. Law,* (*ed.* 1867), § 696, (*ed.* 1852) 258.

In civil actions the same principle prevails. What is asserted in the presence of a party to a suit, and not contradicted by him, is received on the ground that his silence is an admission of the truth of what was said. *Bot-*

Donnelly v. State.

*tans* v. *Sellers,* 5 *Har. & Johns.* 119 ; 2 *Phil. Ev.* (*Cow. & H.,* notes*) 192, *note* 191.

The degree of credit due to such tacit admissions is to be estimated by the jury under the circumstances of each case. 1 *Greenl. Ev.,* § 215.

It is admitted that such evidence should always be received with great caution. In some cases it may be equivocal and of the lightest possible value, in others in may be entitled to much weight. Its value must of necessity be estimated by the jury. If it be doubtful whether the party heard or understood the proposition to which his silent assent is claimed, the jury may determine it. *State* v. *Perkins,* 3 *Hawks.* 377 ; *Perry* v. *The State,* 10 *Georgia* 311 ; 2 *Phil. Ev.* (*Cow. & H., notes*) 194, *note* 191.

The case of the *Commonwealth* v. *Kenney,* 12 *Metc.* 235, does not conflict with the general principle, but suggests important limitations in its application and in the extent of its operation. If the statement is not heard by the accused, or if being heard, he deny it, or if circumstances existed at the moment which prevented a reply or rendered a reply inexpedient or improper, the evidence certainly is of no value. But in this case the exception is taken not to any ruling or action of the court after the answer was given, but to the question itself, and no principle or authority it is believed exists which in the slightest degree impugns the legality of the question.

The eighth exception is, that the court, being asked by the defendant's counsel to charge the jury, that if the jury are satisfied that Moses had no belief in God and in a future state of rewards and punishments, they must disregard his dying declarations, replied by charging that such is the law ; but the jury must be satisfied by the evidence that such was the fact. The law will presume he had such belief until the contrary be proved. The instruction was given precisely as requested by the prisoner's counsel, and of this the prisoner does not and cannot complain. The error alleged is, that the court added, that the want

of religious belief must be established by evidence; the law will presume that he had such belief, until the contrary be proved. Dying declarations are admitted on the ground that the danger of impending death is equivalent to the sanction of an oath, and the persons making them are considered in the light of witnesses, and standing in the same situation as if they were sworn. What, therefore, will exclude the living witness, will exclude his dying declaration. 1 *Greenl. Ev.*, § 157.

The competency of the evidence is open to the same objections, and must be dealt with upon the same principles as that, of a living witness. There is no clearer principles than that, if the want of religious belief in the witness is alleged as a ground of incompetency, the disbelief must be proved by the objector. The well-settled rule cannot be more clearly expressed than in the language of Judge Greenleaf. "Defect of religious faith is never presumed; on the contrary, the law presumes that every man brought up in a Christian land where God is generally acknowledged does believe in Him and fear Him. The charity of its judgment is extended alike to all. The burthen of proof is not on the party adducing the witness to prove that he is a believer, but it is on the objecting party to prove that he is not." 1 *Greenl. Ev.*, § 370. The instruction complained of was correct. The presumption of law is in favor of the competency of the witness, until the contrary is proved. The principle is not confined to objections on the ground of religious belief, but applies to every objection that affects the competency or the credit of the witness. If the witness is objected to on the ground of infamy, or insanity, or imbecility, the alleged ground of incompetency must be shown by the party objecting.

That part of the instruction given in pursuance of the request of the counsel, viz., that if the jury are satisfied that Moses had no belief in God and in a future state of rewards and punishments, they must disregard his dying

Donnelly v. State.

declarations, was incorrect, because it was not a question for the jury. The objection goes not to the credibility, but to the competency of the testimony. The question was solely for the court, not for the jury. The jury were at liberty to give the dying declarations of the deceased just such credit as they deemed them entitled to, to believe or to disbelieve, as their consciences might dictate. But having been admitted by the court, they were not at liberty to reject or disregard them on the ground of a defect in the religious belief of the declarant. As this instruction was in favor of the prisoner, and was given in accordance with the request of his counsel, it constitutes no error of which he can complain.

The ninth exception is, that the defendant's counsel asked the court to charge the jury that the fact of Moses not restoring the money which he had won at gaming to its rightful owner, in the prospect of immediate death, is evidence of a depraved heart, and goes to show that his declarations are not entitled to belief. Also, that the fact of his making no reference to a future state, but smiling in derision when spoken to on the subject, (if the jury believe he did so) is evidence of the like character and effect. To this request the court replied by charging that the jury would give these facts just such weight as they thought they deserved in reference to the credit due to the statements of Moses. The weight of these facts is a question of which the jury are the sole judges. The instruction was at least as favorable to the prisoner as the law would allow. It referred the credibility of the dying declarations of Moses entirely to the jury, in the light of all the evidence, and affected by every fact in evidence prejudicial to the moral character or impugning the religious belief of Moses.

The tenth exception is, that the defendant's counsel asked the court to charge that if the jury believe the evidence of Munter with regard to the length of time Moses had been stabbed, the evidence of the defendant's guilt is

insufficient. The court, in reply, charged that if the jury believed that Moses was stabbed two hours before the alarm, there was certainly no proof that the defendant was there at that time, and they ought to acquit. But they were to decide whether they would believe this statement in view of all the facts in the case. The instruction, as given, is certainly as strong in favor of the prisoner as the law will justify. It may be doubted whether, in view of the mass of conflicting testimony, the court was justified in instructing the jury to acquit, in case they believed that Moses was stabbed two hours before the alarm. The jury, perhaps, were entitled to weigh and decide upon the conflicting testimony without any such express instruction, even though they believed the injury had been inflicted long before the alarm. But this charge, if incorrect, was in favor of the prisoner, was made at his request, and is not the subject of complaint. But it is made the subject of complaint, that the charge was not a direct response to the request. The request related to Munter's evidence ; the charge, without referring to Munter's evidence, bases the instruction on the belief of the jury that Moses was stabbed two hours *before the alarm*, whereas Munter testifies that he thought, from the appearance, the man had been wounded two hours *when he came in*, not two hours *before the alarm*. It is not perceived that the variance could have been at all material, or that it could in anywise have affected the merits of the case. But if it did, the attention of the judge should have been called to the discrepancy, and he should have been requested to charge anew. As the case now stands, the exception is to the charge as given, and not to any refusal or omission to charge as requested.

The assignments of error upon the 11th and 12th exceptions were stricken out, as not containing legal grounds of error.

The thirteenth exception relates to the charge of the court on the subject of giving to the defendant the benefit

Donnelly v. State.

of any reasonable doubt. The exception leaves it entirely uncertain what particular part of the charge is excepted to, and what constitutes the ground of complaint. The court charged that the state was bound to prove beyond all reasonable doubt that the injury of which the deceased died was inflicted by the defendant; that the evidence must be such as to exclude from their mind all reasonable doubt of the guilt of the accused. The court added, "If upon a careful review of all the evidence, you ask your own inward conscience, is he the guilty one, and it answers, I doubt if he is, you should acquit. But if the anananswer is, I have no doubt of it, you should say so, and leave the consequences to Providence." It may be, as is contended by counsel, that this is not a very precise definition of what is meant by reasonable doubt. But it instructs the jury in substance, and in terms sufficiently intelligible, that if, upon a careful review of all the evidence they have in their mind a doubt of the prisoner's guilt, they should acquit. The law would not permit, and counsel could scarcely ask for instructions more favorable to the prisoner.

The fourteenth exception is to the charge of the court defining the degrees of murder. Upon this point the court said, "Our statute provides that all murder, by any kind of willful, deliberate, and premeditated killing, shall be deemed murder of the first degree. It is not necessary that the premeditation and deliberation should be for any specific period before the fatal act. It is sufficient if they exist the moment before and at the infliction of the mortal blow. If the defendant came into Moses' room when he was asleep, and with a willful, deliberate, and premeditated determination of killing him, for however short a time before, and plunged the dagger in his throat, he is guilty of murder of the first degree." In The State v. Spencer, Ch. Just. Hornblower charged the jury that " the premeditation or intent to kill need not be for a day, or an hour, or even a minute. For if the jury believe there

was a design and determination to kill distinctly formed in the mind at any moment before, or at the time the pistol was fired, or the blow was struck, it was a willful, deliberate, and premeditated killing, and therefore murder in the first degree." *Wharton's Cr. Law* (ed. 1857), § 1103. To constitute murder in the first degree under this clause of the statute, there must be an intention to take life. No particular length of time need intervene between the formation of the purpose to kill and its execution. It is not necessary that the deliberation and premeditation should continue for an hour or a minute. It is enough that the design to kill be fully conceived and purposely executed. In the charge in Spencer's case, it is held that the terms deliberate and premeditated, used in the statute, import no more, provided the killing is willful, than the term malice aforethought, at the common law; and that consequently all willful killing which was murder at the common law is murder in the first degree under the statute. This view is fully sustained by the recent case of *The People* v. *Clark,* 3 *Selden* 385. By the New York statute, to constitute murder, the homicide must be perpetrated from a *premeditated design* to effect the death of the person killed or of any human being. The court held that an intention to kill existing at the instant of striking the fatal blow is a premeditated design within the meaning of the statute. The clear weight of authority is, that wherever there is, in committing a homicide, a specific intention to take life, there is, in the language of the statute, a willful, deliberate, and premeditated killing, and the offence is murder in the first degree. *Wharton's Cr. Law* (ed. 1857), § 1084 *et seq.*, (ed. 1852) 420 *et seq.*

But whatever view may be taken of the true construction of the statute, there is no error in the charge which could by possibility have prejudiced the prisoner upon his trial. That part of the charge which applies the law to this particular case, and by which the jury were instructed in the performance of their duty, is clearly correct, what-

ever view may be taken of the true construction of the statute.

We find no error in the record, and are of opinion that the judgment below be in all things affirmed.

We have thus endeavored to discharge the solemn duty we owe to the prisoner, by examining and deciding each of the exceptions urged against the validity of the record and the legality of his trial. We have done so irrespective of the form in which those exceptions have been presented for our consideration. We desired that the prisoner should have the full benefit of every exception designed to be presented, without the least embarrassment from defects of form.

But having disposed of the case upon the merits, we deem it our duty to add, that the bills of exceptions and the assignment of errors in this cause are not in conformity with law ; that the court below might properly have refused to sign the bills, and that this court would have been warranted in treating them as nugatory. The act (*Nixon* 650, § 213,) directs that if he who alleges an exception, *instantly writes* the same, and requires that the justices shall put their seals thereto, such justices shall do so. It manifestly intends that the bill of exceptions shall be prepared and sealed immediately during the progress of the trial. And there are very important reasons why, in a matter of life and death especially, this should be strictly complied with. In this case the original bills of exceptions are printed, showing that they were not sealed till long after the trial. Again, these bills of exceptions do not specify the grounds of objection upon which they are founded. It is a rule applicable to all objections to the reception of evidence that the ground of objection must be distinctly stated at the time, or it will be held nugatory. 1 *Greenl. Ev.*, § 421 ; *Camden* v. *Doremus*, 3 *Howard S. C. Rep.* 515, 530.

" A party who objects to evidence should state specifically the grounds of his objection. It is not sufficient to

object generally that the evidence is illegal, or that the witness is incompetent, but the party objecting must put his finger on the very point to apprise the court and his adversary of the precise objection he intends to make." *Elwood* v. *Deifendorf*, 5 *Barb. S. C. R.* 398. In several of these exceptions the court have been utterly at a loss to know the ground of objection, or whether it is to the evidence itself, or to the time or manner of offering it. The record throws no light on these questions.

So in the assignment, the grounds of error should be specified. The adverse counsel are entitled to know what the exception is, and the court are not required to search for errors not definitely pointed out. These suggestions are made that the court may not be understood as approving or sanctioning the practice which has been adopted in this case.

AFFIRMED, 2 *Dutch.* 601. *Cited in State* v. *Johnson*, 1 *Vr.* 188; *State* v. *Robinson*, 6 *Vr.* 74.